# EXHIBIT C

```
 1            UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
 2

 3   - - - - - - - - - - - -X
     SUZANNE ALFONSO, on       )
 4   behalf of herself and     )
     other similarly           )
 5   situated employees,       ) NO.:  3:21-cv-01644(SVN)
               Plaintiffs)
 6                             )
     FEDEX GROUND PACKAGE      )
 7   SYSTEM, INC,             )
               Defendant. )
 8   - - - - - - - - - - - -X

 9

10

11

12

13

14            DEPOSITION OF:  ROBERT CRANDALL, MBA
15            DATE:  June 15, 2023
              HELD AT:  VIA WEB-BASED VIDEO CONFERENCE
16

17

18

19

20

21
     Reporter:  RENATE REID, RPR
22   BRANDON LEGAL TECH LLC
     37 Pinnacle Mountain Road
23   Simsbury, Connecticut 06070
          (860) 528-2244
24

25
```

 1  when the randomizer is triggered, it happens;
 2  people get checked, as a general rule.  But there
 3  are probably odds and ends here; and, certainly,
 4  there are instances where someone has a bag and
 5  doesn't put it through the bag drop, for example,
 6  and just walks in.
 7          And so, there's all kinds of sort of
 8  individualized things where, occasionally, the
 9  policy is not as strictly adhered to, because I
10  guess these people are all human.  But, generally,
11  if you're in the randomizer, the security guard
12  will check.
13  Q.  And about a minute ago, you mentioned that the
14  walk-throughs were basically a zero.
15  A.  Yes.
16  Q.  Can you elaborate on what you meant by that?
17  A.  Well, it would be easier to watch the video of
18  a walk-through; but, basically, you can see on an
19  exit, for example, that someone just walks out.
20  They walk through, like, you know, some of the
21  smaller facilities.  They use -- sometimes they use
22  the same entrance and exit, and you just see the
23  employees walk on out, with not being delayed at
24  all.  They'll walk right past the guard and just
25  keep walking.

Robert Crandall, MBA

Suzanne Alonso, v. Crunch Fitness and Prestige Gym and Package Systems, Inc.

Job Date:6/15/2023

1  Q.  And if that happened, was there an amount of

2  time assigned to that individual?

3  A.  No, because you didn't stop for the security.

4  So, generally, the security time starts when you're

5  delayed by it --

6  Q.  I see.

7  A.  -- if you think about it.

8  Q.  So, for example, if there's a person entering a

9  facility and it takes them ten seconds to walk from

10  the beginning of the frame to the end of the frame,

11  but they're not stopped by the security guard, that

12  time isn't reflected in your report?

13  A.  That would be a walk-through.  So, in other

14  words, let's give you a hypothetical -- your

15  hypothetical like that's a walk-through.  Someone

16  just walks through the front door, walks through

17  the turnstile and keeps going, doesn't delay at

18  all; then, that would be a walk-through.  As soon

19  as they pause, they're going to start measuring the

20  delay due to the security.

21  Q.  All right.  And so, when you're creating your

22  tables in the report, that individual that I just

23  gave you the example of is included in the report,

24  but the amount of time assigned to them is zero?

25  A.  That's correct.

1  Q.  And for every person who had a walk-through,

2  was there some measurable amount of time that they

3  were in the frame?  And I understand you didn't

4  record it, because it wasn't a delay --

5  A.  By definition --

6  Q.  -- but was there a measurable amount of time in

7  the frame?

8  A.  By definition, they're in the frame.  You have

9  to see them to code them as a -- as an observation.

10  Q.  Fair point.  Okay.

11       But, nevertheless, there's some measurable

12  amount of time that they're on the screen for your

13  team to observe?

14  A.  That's correct.

15  Q.  And if you included, you know, for example,

16  that ten-second individual on the way in, in your

17  number, would that increase the average amount of

18  time in security, if you were including the

19  walk-throughs?

20  A.  Well, I think what you're just asking, if you

21  were to change it from looking at security time

22  versus just on-camera time, on-camera time would be

23  greater than security time, because you may finish

24  the security process and walk away, and it may take

25  you three steps to exit the frame, for example.

1   Q.  Right.  But for every person on the way in or

2   every person on the way out, there's some amount of

3   time where they're in the security area, walking,

4   that's not captured; is that right?

5   A.  No.  If they're on camera, they're on camera.

6   And the issue -- I think the distinction -- you're

7   asking about two different metrics.  Metric one is,

8   you're saying on-camera time.  That's different

9   than security-delay time.

10  Q.  Mm-hmm.

11  A.  And so, that's the distinction.  And the

12  numbers in my report reflect time relating to

13  security delay.

14  Q.  So, for the people who are delayed, you're only

15  recording and, you know, calculating the time of

16  the delay.  Once the delay is over, whatever it

17  takes them to walk out of the frame is not being

18  included in the report; is that right?

19  A.  That's correct.  So, let's say I -- I walk

20  through -- a lot of the places have lockers, for

21  example, right, in the front, outside of the

22  security.  So, let's say somebody walks through the

23  security; they're done.  And they go to their

24  locker, and then they sit down.  They open a locker

25  up and they get stuff out.  We're not counting that

 1     And when you say into the security area --
 2  I'll give you an example -- you could walk from the
 3  outside in.  Someone may have external cameras, and
 4  it might be one or two doors, for example.
 5  Q.  Mm-hmm.
 6  A.  So, there's multiple ways for the doors are
 7  next to each other.  So, I'm not sure if it's --
 8  it's a distinction without much of a difference, is
 9  my point.
10  Q.  I get what you're saying.
11     Essentially, what I'm asking is, did all
12  employees come in the same way and leave the same
13  way?
14  A.  My understanding is, they're supposed to come
15  and go through security.
16  Q.  Mr. Crandall, is there a chart or a table that
17  shows what percentage of the subjects you observed
18  on the inbound were walk-throughs?
19  A.  Well, there's some statistics that talk about
20  it in a variety of places.  So, if you go down,
21  there's some charts as well.
22     So, take a look at page 32.
23  Q.  Okay.  I'm there.
24  A.  See these charts?
25  Q.  Yes.

```
 1   A.   The red bar is the walk-throughs with no

 2   security time.

 3   Q.   Got it.   Okay.   I just wanted to make sure I

 4   was -- I assumed there had to be.   I just wanted to

 5   make sure I wasn't missing it.

 6   A.   Yep.

 7   Q.   So, on the inbound, 14.7% of people were

 8   walk-throughs; and on the outbound, 53.9%?

 9   A.   Much larger percentage on the outbound.

10   Q.   If I could turn over to page 8 of the report.

11   A.   Yes.

12   Q.   And in paragraph 10, we discuss -- well,

13   withdrawn.

14        In paragraph 10, you discuss, it appears --

15   it's your understanding that FedEx pays to the

16   minute.

17   A.   Yes.

18   Q.   Please walk me through what you're intending to

19   convey in this particular paragraph.

20   A.   Well, if you're paying to the minute and you

21   add ten seconds to someone's time, it may not even

22   turn over another minute of pay.

23   Q.   Is that the general point of this paragraph?

24   A.   That's the general point, which is -- you know,

25   let's say you've been -- you've been paid for
```

1   59 minutes, or whatever, 8 hours and -- 7 hours and

2   12 minutes, and you -- the real punch is 7 hours,

3   12 minutes and 10 seconds.  Well, let's say you

4   arrive, right?  And you get paid -- you arrive at

5   7:00 a.m. and 15 seconds.  And you -- that extra --

6   and then you clocked in at 7:00 a.m.; and at some

7   point, you picked up one or two seconds on the back

8   side.  It just -- it takes a little bit of a

9   seconds here or there that are kind of meaningless

10  in a pay-to-the-minute scheme, which is what most

11  employers who don't round do.  I don't know any

12  employers who pay to the second yet, and I've seen

13  a lot of them.

14        But the basic point is, the seconds may not

15  be enough to equate to another minute of pay.

16  Q.  And can I ask, did FedEx provide you any

17  information upon which you based the conclusions in

18  that paragraph?

19  A.  No.  I mean, obviously, this is the only place

20  I cite to a deposition, I think, in the report.

21  And it's just the proposition of pay-to-the-minute.

22  So --

23  Q.  And do you know if either of those witnesses

24  testified that there was a rounding policy at

25  FedEx?

1  A.  I believe they said they paid to the minute, in

2  those depositions.  I did not re-review them in

3  connection with preparing for this.

4  Q.  And so, other than those two pages of those

5  depositions, you didn't look at any other

6  information or weren't given any other information?

7  A.  Well, if they say they paid to the minute, they

8  paid to the minute.  I mean, if they rounded, it

9  might be even more different, if you will.  And

10  then, you could also, you know, potentially see

11  things like, did they take a longer break and get

12  paid for more time.

13        I mean, you're starting to really get down

14  to, like, trying to measure microscopic amounts of

15  time, both for and against; and it could devolve

16  into a somewhat ridiculous exercise, if you get

17  closer and closer.

18  Q.  So, just to make -- have you seen any data that

19  shows a punch to the second?

20  A.  I don't recall the punch records, particularly.

21  I was looking at them primarily just to see rough

22  ideas of count by facility, so --

23  Q.  So, if I can just ask, are you aware of any

24  member of the class who punched in at, say,

25  7:00 o'clock and 15 seconds versus 7:00 and

```
 1   30 seconds?  And if so --
 2   A.  I'm not sure -- I just don't know if that data
 3   has seconds or not, so -- I didn't look at it.
 4   Again, I only used it to identify number of people
 5   at various facilities, roughly.
 6   Q.  I mean, is there any way to prove when somebody
 7   is -- because I think the point of this paragraph
 8   is that some people may be getting extra time on
 9   the way, you know, based on how the clocks work.
10          Is there any way to prove when that
11   actually happened?
12          MR. McQUADE:  Object to the form.
13   A.  If there are seconds in the data, then you can
14   look at it; but, again, I think, at some point,
15   you're splitting so many hairs that -- you know,
16   it's -- it might devolve into a very painful
17   individualized analysis that may not have much
18   meaning.
19   BY MR. DURKIN:
20   Q.  All right.  I want to slide down to the next
21   paragraph.  It's paragraph 11; starts on the same
22   page.
23   A.  Okay.
24   Q.  And it says, generally, employees who choose to
25   carry a bag into the facility will have some
```

1   security time, again, often just seconds.

2          When you watched the videos, did you

3   observe people, either inbound or outbound, having

4   their bags inspected?

5   A.   Yes.

6   Q.   On both inbound and outbound or just one?

7   A.   Yeah.  There's two things about it, actually.

8   I would say that around half the people brought

9   bags; but the difference is that, not every time

10  they came through with a bag, the bag was checked.

11  So, if you were to look at table 27 on page 44 --

12  let me know when you're there.

13  Q.   Go ahead.

14  A.   So, you can see that top table; that's the

15  inbound.  And you can see that, roughly, at 49% of

16  the entrances, someone had a bag; but a bag check

17  was checked only about 80% of the time -- 79.8, to

18  be precise.  And on the way out, you know, of the

19  bags that were present, only 12 and a half percent

20  of them were checked.  But you were far more likely

21  to be checked on the way out with a bag at Windsor,

22  for example, than at West Stratford -- West

23  Stratford or South Windsor, for example.

24  Q.   And when an employee was having their bag

25  inspected by a security guard, were they able to

```
 1              C E R T I F I C A T E

 2          I, RENATE REID, a Notary Public duly

 3    commissioned and qualified in and for the State

 4    of Connecticut, do hereby certify that pursuant

 5    to notice there came before me on the 15th day of

 6    June, 2023 the following-named person to wit:

 7              ROBERT CRANDALL, who was by me duly sworn to

 8    testify to the truth and nothing but the truth;

 9    that he was thereupon carefully examined upon his

10    oath and his examination reduced to writing by

11    me; that this deposition is a true record of

12    the testimony given by the witness.

13        I further certify that I am neither

14    attorney nor counsel for nor related to nor

15    employed by any of the parties to the action in

16    which this deposition is taken, and further that

17    I am not a relative or employee of any attorney

18    or counsel employed by the parties hereto, or

19    financially interested in this action.

20        IN WITNESS THEREOF, I have hereunto set my

21    hand this 26th day of June, 2023.

22

23    Renate Reid, RPR and Notary Public

24    My Commission Expires:

25    July 31, 2026
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

CIVIL ACTION NO:  3:21-cv-01644(SVN)

SUZANNE ALFONSO, ON BEHALF OF          )
HERSELF AND OTHER SIMILARLY            )
SITUATED EMPLOYEES                     )
                                       )
                                       )      VOLUME 2
vs.                                    )
                                       )
FEDEX GROUND PACKAGE SYSTEM,           )
INC.                                   )
                                       )

REMOTE VIDEO CONFERENCE

DEPOSITION OF: Robert Crandall, MBA
DATE TAKEN: AUGUST 4, 2023

BRANDON LEGAL TECH, LLC
37 Pinnacle Mountain Road
Simsbury, CT  06070
(860) 528-2244
REPORTER:  SARAH B. NAJEMY, CSR, LSR #00069

1    A.   Well, so the litigation services handbook is

2    the only textbook for experts.  And they selected me

3    as the wage and hour author.  And it some instances

4    where there's no data I think Mt. Clemens' answer to

5    the proposition that you can fill that void by

6    collecting scientific data from other methodologies.

7    Q.   Do you recall the facts of the Mt. Clemens

8    case at all?

9    A.   Not specifically, no.

10   Q.   And from the time you received our first

11   amended complaint until today have you read the Mt.

12   Clemens case?

13   A.   No.

14   Q.   Is it your understanding that the Plaintiffs

15   in this case are suing for all the time they spent

16   whether walking or in security regardless of whether

17   it's as a result of a requirement by FedEx?

18              MR. MCQUADE:  Objection to form.

19              THE WITNESS:  Well de facto that's your

20         what your expert analysis has done, and gone

21         a little beyond that time.  Based on some of

22         the assumptions that she's included.

23   BY MR. DURKIN:

24   Q.   Okay.  So it's not your understanding --

25   withdrawn.  So it's your understanding that the

1    Plaintiffs are claiming something beyond what is the

2    shortest amount of time FedEx requires them to be on

3    the premises?

4              MR. MCQUADE:  Objection to form.

5              THE WITNESS:  You sort of changed the

6              question.  Are we talking about -- FedEx

7              doesn't -- when you say requires, that's not

8              really what we're measuring.  We're measuring

9              security time if any.  And we're looking at

10             the duration of time it would be to walk to a

11             particular time clock.  So that's what the

12             expert reports have dealt with so far.

13   BY MR. DURKIN:

14        Q.   I think I read somewhere in your report that

15   your description of segment three time is the time

16   between the security area and the various time clocks

17   in the facilities.  I'll give you a moment to lock at

18   it if you need it.

19        A.   Yeah, I want to make sure.  So segment one is

20   the start to security.  Segment two is security to --

21   start and end of security.  And then segment three is

22   security to the walking time -- or to the clock if you

23   will.  So, yeah, I think that's correct.  And.

24        Q.   Okay.  And if the segment three time in this

25   case -- withdrawn.  If the Plaintiffs were claiming

1    for segment three like just the shortest amount of

2    time it reasonably takes to get from security to time

3    clock would it be material if they took a longer path?

4        A.   If they agreed just to take the shortest

5    route then effectively they're accepting that the

6    longer route assumption is not an issue.

7        Q.   So for example if -- I'm just going to make

8    up an example here.  If in the winter facility there

9    is only one time clock and it took two minutes for an

10   average employee to walk straight to that time clock

11   on a straight line and that was the time they were

12   suing for, if they happen to take two and a half

13   minutes because a half minute was spent at a vending

14   machine that wouldn't be material to the case?

15               MR. MCQUADE:  Objection to form.

16               THE WITNESS:  If the Plaintiffs are

17               excluding that amount -- it's called the

18               excess time -- by taking a circuitous route

19               or stopping to talk to somebody for some

20               reason then that extra time is not an issue

21               by definition.

22   BY MR. DURKIN:

23       Q.   I know I'm jumping around a bit here.  But

24   going back to page 34 of the report.  It looks like

25   you read the -- well, withdrawn.

1          You cite to the deposition of Craig Carter,

2     Earl Brunk, Jason Rodriguez, Carl Davis, Roy Holcomb,

3     Jan Kaufman, and Stephen Slater.  That's seven

4     depositions of witnesses.  Did you read the entirety

5     of each was those depositions?

6          A.   At some point I read these.  I don't think I

7     cite to any of these depos in connection with the

8     report.

9          Q.   Okay.  Mr. Crandall, is it true that from the

10    information you've received through depositions and

11    from FedEx that every employee is required to spend

12    some time from entering the building to getting to a

13    time clock, and from the time they punch out walking

14    and getting to the exit?

15               MR. MCQUADE:  Objection to form.

16               THE WITNESS:  Is it true that there is

17          no such thing as teleportation?  So you have

18          to cover a physical distance.  And that

19          physical distance will take some time.

20    BY MR. DURKIN:

21         Q.   Is there information you received from

22    FedEx -- withdrawn.  I think you covered it.  It's

23    2:51.  Can we take a five minute break?

24               MR. MCQUADE:  Sure.

25               THE WITNESS:  Sure.

```
 1              (A recess was taken 2:51-3:00)

 2                   MR. DURKIN:  Back on the record.

 3   BY MR. DURKIN:

 4        Q.   Mr. Crandall, I have shared my screen again.

 5   And it is pages three and four of your rebuttal

 6   report.  It's paragraph three.  Do you see that?

 7        A.   I do.

 8        Q.   So it says here -- I'll scroll down to the

 9   fourth page.  It says here towards the middle, "The

10   focus of this rebuttal is three-fold.  First to

11   discuss the extent of variation in the amount claimed

12   walking time associated with segment one, segment two,

13   and segment three, and the analytical implications

14   that would result from the court determining that all

15   walking time or some walking time segments are not

16   compensable."  Did I read that accurately?

17        A.   Yes.

18        Q.   And I think we discussed that a little bit a

19   few minutes ago.  But I just want to take this one by

20   one.  If the court were to conclude as to segment one

21   time that the walking time in that segment is

22   compensable -- withdrawn.

23              If the court were to conclude as to segment

24   one that only the shortest amount of walking time is

25   compensable would it matter if an employee took a
```

 1   longer route on any particular day?

 2              MR. MCQUADE:  Objection to form.

 3              THE WITNESS:  I think you asked that

 4         question before the break.  But again if the

 5         court were to limit that then by definition

 6         you answer your own question.  If the court

 7         says we're only going to look at the shortest

 8         time then the longer more circuitous routes

 9         would not be an issue.

10   BY MR. DURKIN:

11       Q.   Or if an employee stopped to talk on their

12   phone?

13       A.   I mean there could be other issues based on

14   my understanding of wage and hours claims that may

15   trigger something.  In other words, like in California

16   for example that might be assigned personal time.  But

17   if they were stopped doing that, who knows if they're

18   walking doing that I'm not sure how the court in

19   Connecticut would look at that.  But again that's the

20   court's call, not mine.

21       Q.   So if let's say it just takes a minute,

22   segment time is one minute.  If an employee went to

23   the bathroom while walking on segment one and took two

24   minutes to traverse that distance it wouldn't matter

25   because they only had the one minute?

```
 1              MR. MCQUADE:  Objection to form.
 2              THE WITNESS:  If we just say that the
 3         shortest distance is the distance then these
 4         other factual patterns while walking become
 5         less of an issue.
 6   BY MR. DURKIN:
 7        Q.   Sticking with paragraph three, the second
 8   purpose says, "Second, to discuss the analytical
 9   implications that would result from the court setting
10   a fact pattern based threshold for liability given the
11   underlying variation in the distance measurement data
12   and the different fact patterns observed during the
13   security check process."  Did I read that right?
14        A.   Yes.
15        Q.   And can you tell me which paragraphs of the
16   rebuttal correspond to that second purpose?
17        A.   There's a broad discussion in the back part
18   of this report where we're showing the variation in
19   those times even within the same facility.  There are
20   some charts going back.  And obviously the fact
21   patterns you and I already discussed a little bit.
22   Paragraph 11, 12 -- well frankly most of the back half
23   of the report deals with that.  There are some charts
24   that show Exhibits 1 and 2 on pages 17 and 18 for
25   example show the variation of walking time and clock
```

| | |
|---|---|
| 1 | in and clocking out by Dr. Radwin.  So if the court |
| 2 | were to draw a line and say below this number that's |
| 3 | not compensable.  Well depending on where that line is |
| 4 | drawn you could have all below or some below. |
| 5 | Q.   And then it ends, "Finally, third, to discuss |
| 6 | the variation in clocking patterns that may indicate |
| 7 | some individual choices are made by employees in terms |
| 8 | of what time clocks to use to clock in or clock out." |
| 9 | What paragraphs of your report correspond to that |
| 10 | third purpose? |
| 11 | A.   If you go back towards the back end you've |
| 12 | got Exhibits 3 and 4, sort of paragraph 27 onward. |
| 13 | 27, 28, are the two that really deal with that.  And |
| 14 | then there are some tables, Exhibit 5 and 6, that sort |
| 15 | of talk about how that variation is going to split |
| 16 | distributionally across the various routes that Dr. |
| 17 | Fox calculates. |
| 18 | Q.   And is it your opinion that if the walking |
| 19 | time at issue in this case is limited to the shortest |
| 20 | amount of time that those variations are less of an |
| 21 | issue? |
| 22 | A.   Well, wait a minute.  I'm trying to -- so are |
| 23 | you saying if somebody walked to time -- what you're |
| 24 | arguing here, if I understand correctly, is that we |
| 25 | take instead of what has been done by Dr. Fox and what |

1              amount of time at security before there are

2              some elements there.  So again I'm not the

3              guy who's going to be calling balls and

4              strikes on what the law is.  The court's

5              going to do that.  My job is to say okay once

6              the court rules on this what are the

7              analytical implications?  What do we have to

8              collect from a data perspective?  What can we

9              do and what can we not do?  What's going to

10             be a reliable assessment of this?  And I

11             provide some assistance to the trier of fact

12             hopefully about what the implications may be

13             if they choose legal decision A versus legal

14             decision B.  But I'm not the person that

15             makes that call.  That's the court.

16     BY MR. DURKIN:

17         Q.    Right.  There's a paragraph, paragraph 12

18     where you go to through certain examples.  Is that the

19     one you're referring to?

20         A.    Yes.  Not sure about the paragraph number,

21     but yes.

22         Q.    Okay.  I'll show it to you very quickly just

23     so we're on the same page here.  It's right after the

24     fact discussion here.  I'll just give you a moment.

25     This is what you're referring to?

1    A.    That's correct.

2    Q.    Okay.  And the purpose of this paragraph is

3    to assist the trier of fact in determining the reach

4    of whether the walking time is part of the commute or

5    not?

6    A.    I think that you know it's to help them

7    understand -- consider the various issues.  Obviously

8    they can reject whatever I say.  It's up to them to

9    make their call.  But it is very similar to what we

10   see in most "normal" employment settings involving

11   hourly workers.

12   Q.    Back to paragraph six.  The second specific

13   defense you mention is the de minimis defense.  In

14   preparing your rebuttal report were you provided with

15   any information from FedEx as to their ability or

16   inability to record segment one time?

17              MR. MCQUADE:  Objection to form.

18              THE WITNESS:  You mean the time on the

19        bridge for example?

20   BY MR. DURKIN:

21   Q.    Sure.  But just what you refer to as segment

22   one generally here.

23   A.    I haven't even addressed that question.

24   Q.    So FedEx hasn't given you anything relating

25   to that particular topic?

```
 1              MR. MCQUADE:  Objection to form.

 2              THE WITNESS:  I don't have any documents

 3          that would evaluate segment one time.  Which

 4          is just for the purpose of the record, it's

 5          basically outside the front door.  So it's

 6          after you exit the building, or before you

 7          enter the building, is where segment one is.

 8  BY MR. DURKIN:

 9      Q.   But my question is, have you seen anything

10   from FedEx that addresses their ability or inability

11   to actually record that time?

12              MR. MCQUADE:  Objection to form.

13              THE WITNESS:  How would you record the

14          time per se?  Are you saying that you put the

15          time clock outside the building?

16  BY MR. DURKIN:

17      Q.   Well what I'm asking is just generally have

18   you seen anything, documents or conversations with

19   FedEx workers, relating to whether or not they were

20   able to figure out how much time segment one time

21   took?

22      A.   I haven't --

23              MR. MCQUADE:  Objection to form.

24              THE WITNESS:  I haven't seen any

25          documents or anything related to segment one
```

 1              time.

 2       BY MR. DURKIN:

 3            Q.    And the same question for segment two time?

 4            A.    I'm not aware of any studies that FedEx has

 5       done other than my own.  Segment two for the record is

 6       time in the security area.

 7            Q.    What about for segment three?

 8            A.    I'm not aware of any studies that FedEx has

 9       done for that.

10            Q.    All right.  Moving on to paragraph seven.

11       Give me a second.  Actually we're going to skip that.

12       We're going to move down a little bit.  Because this

13       actually gets to a different part of the report I

14       wanted to ask you about anyway.

15            A.    Okay.

16            Q.    So I think paragraph seven and paragraph 25

17       are similar in this way.  And you tell me if you think

18       I'm wrong.  It highlights that the amount of time to

19       walk certain paths in the various FedEx facilities may

20       differ inbound and outbound?

21                   MR. MCQUADE:  Objection to form.

22                   THE WITNESS:  Meaning that -- yes, I

23            mean it varies.

24       BY MR. DURKIN:

25            Q.    Okay.

1    A.    Simply, true.

2    Q.    So for example in paragraph 25 you

3 specifically point out that inbound time generally can

4 vary from 14 seconds to six minutes and 29 seconds.

5 And then outbound from 14 seconds to six minutes and

6 40 seconds?

7               MR. MCQUADE:  Objection to form.

8               THE WITNESS:  I think this is talking

9          about Middletown.  Which is the one that has

10         the bridge time outside the door included.

11         So if you were to adjust given segment one it

12         would still be variable, but less.  With that

13         being said, yes.  In one particular facility

14         you could have a broad range.  Again when I

15         say broad range we're still talking minutes

16         and seconds.  It's not hours.

17 BY MR. DURKIN:

18    Q.    Well let's just stick with the Middletown

19 example.  Because I think there's three different -- I

20 mean, you mentioned Middletown and the Hartford

21 Willington facility specifically.  And then among that

22 there's I thought a general range.  But we can skip it

23 for the moment.  Let's stick to just the Middletown

24 portion of this paragraph.  It says -- I'm just going

25 to start reading towards the bottom.  It says, "In

```
 1                        CERTIFICATE OF REPORTER

 2

 3      I, Sarah B. Najemy, a Licensed Shorthand Reporter and
        Notary Public duly commissioned and qualified within
 4      and for the State of Connecticut, do hereby certify
        that pursuant to Notice, there came before me  ROBERT
 5      CRANDALL, MBA, on AUGUST 4, 2023, who was by me duly
        sworn to testify to the truth and nothing but the
 6      truth; that he was thereupon carefully examined upon
        his oath and his examination reduced to writing under
 7      my direction by means of Computer Assisted
        Transcription, and that this deposition is a true
 8      record of the testimony given by the witness.

 9

10      I further certify that I am neither attorney nor
        counsel for, nor related to, nor employed by any of the
11      parties to the action in which this deposition is taken
        and further that I am not a relative or employee of any
12      attorney or counsel employed by the parties hereto, nor
        financially interested in the outcome of the action.

13

14      IN WITNESS THEREOF, I have hereunto set my hand August
        9, 2023.

15

16

17

18

19

20      _____

21               Sarah B. Najemy

22

23      CSR, LSR # 00069
        Notary Public
24      My commission expires:  8-31-2025

25
```